**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**
_____

**THOMAS G. DAVIS,** *et al.*,

                              **Plaintiffs,**


        v.                                          **1:08-CV-1064**
                                                         **(FJS)**

**PENSION BENEFIT GUARANTY CORPORATION,**

                              **Defendant.**
_____

**APPEARANCES**                    **OF COUNSEL**

**MILLER & CHEVALIER**              **ANTHONY F. SHELLEY, ESQ.**
655 15th Street, NW                 **TIMOTHY P. O'TOOLE, ESQ.**
Suite 900                           **BRIAN A. HILL, ESQ.**
Washington, DC 20005
Attorneys for Plaintiffs

**PENSION BENEFIT GUARANTY**         **JOSEPH N. KRETTEK, ESQ.**
**CORPORATION, OFFICE OF THE**
**CHIEF COUNSEL**
1200 K Street, NW
Suite 340
Washington, DC 20005
Attorneys for Defendant


**SCULLIN, Senior Judge**


**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

Plaintiffs are more than 1,700 mostly retired US Airways pilots who are the beneficiaries of the now-terminated Retirement Income Plan for Pilots of US Airways, Inc. ("Plan"). In their second amended complaint, Plaintiffs allege that Defendant Pension Benefit Guaranty Corporation ("PBGC"), the statutory trustee of the Plan,[1] erred in making final benefit determinations by providing lesser benefits than the Plan and ERISA entitled Plaintiffs to recover. *See generally* Dkt. No. 36.

In March 2007, Plaintiffs filed a consolidated administrative appeal with the PBGC Appeals Board; and, in February 2008, the Appeals Board issued a final decision on Plaintiffs' claims largely in PBGC's favor. Plaintiffs then filed suit in federal court challenging the Appeals Board's determination as contrary to the Plan's language and ERISA.

There are four motions currently before the Court: (1) Plaintiffs' motion for summary judgment on claims one, two, three, six, seven, nine, ten, eleven, and twelve of their second amended complaint; (2) PBGC's cross-motion for summary judgment on those claims as well as on claim four; (3) Plaintiffs' motion to compel an immediate ruling from the PBGC's Appeals Board in the pending administrative appeal of Captain Peterman's benefit determination and for an order directing the Appeals Board to supplement the administrative record with any documents that Captain Peterman referenced in his appeal; and (4) PBGC's resubmitted cross-

---

[1] In 2003, because of US Airways' bankruptcy, PBGC became the statutory trustee of the Plan, a role it typically takes on when a pension plan covered by ERISA terminates without enough assets to pay all of its promised beneficiaries. *See Boivin v. US Airways, Inc.*, 446 F.3d 148, 150-51 (D.C. Cir. 2006) (citation omitted). As statutory trustee of the Plan, PBGC "wears two hats: one as guarantor of ERISA's insurance program . . . and one as trustee." *Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 331 (4th Cir. 2007).

motion for partial summary judgment on claim eight of Plaintiffs' second amended complaint.
*See* Dkt. Nos. 71, 74, 83, & 90.

## II. BACKGROUND

Plaintiffs filed their initial complaint in this action against PBGC on June 20, 2008.  *See* Dkt. No. 1.  Plaintiffs also filed a notice of a related case, *Oakey v. US Airways Pilots Disability Income Plan*, No. 1:03-CV-2373.  *See* Dkt. No. 2.  Plaintiffs filed their first amended complaint on August 15, 2008.  *See* Dkt. No. 9.  PBGC filed a motion to dismiss claims five and ten of Plaintiffs' amended complaint and to strike Plaintiffs' request for attorney's fees and for a jury trial.  *See* Dkt. No. 10.  On March 17, 2009, the Court (Robertson, J.) denied PBGC's motion to dismiss claims five and ten and granted its motion to strike.  *See* Dkt. No. 33.  Plaintiffs then filed a motion for a preliminary injunction on August 29, 2008, which the Court denied on December 2, 2008.  *See* Dkt. Nos. 11 & 27.

On June 23, 2009, Plaintiffs filed a second amended complaint.  *See* Dkt. No. 36.  On March 12, 2010, Plaintiffs filed a motion for partial summary judgment on one of the twelve claims in their second amended complaint — claim eight.  *See* Dkt. No. 45.  PBGC moved to strike Plaintiffs' motion, and the Court denied that motion.  *See* Dkt. No. 47.  PBGC then filed a cross-motion for partial summary judgment on claim eight of Plaintiffs' second amended complaint.  *See* Dkt. No. 54.  In a Memorandum Opinion and Order dated September 30, 2011, the Court (Kennedy, J.) denied the parties' cross-motions for partial summary judgment on claim eight *without prejudice to renew* on procedural grounds because Plaintiffs improperly relied on non-record materials.  *See* Dkt. No. 82.

On November 15, 2010, Plaintiffs filed a motion for summary judgment on claims one,

two, three, six, seven, nine, ten, eleven, and twelve; and, on February 8, 2011, PBGC filed a

cross-motion for summary judgment thereto.  *See* Dkt. Nos. 71 & 74.

On October 19, 2011, Plaintiffs filed a motion to compel the PBGC's Appeals Board to

issue an immediate ruling on the pending administrative appeal of Captain Jerome Peterman, a

named plaintiff in this case, whose appeal of his final benefit determination had been before the

PBGC for approximately eight months.  *See* Dkt. No. 83.  PBGC opposed that motion.  *See* Dkt.

No. 84.

Then, on December 2, 2011, PBGC resubmitted its cross-motion for partial summary

judgment *on claim eight* of Plaintiffs' second amended complaint.  *See* Dkt. No. 90.  In response,

Plaintiffs filed a motion to hold PBGC's resubmitted motion for partial summary judgment on

claim eight in abeyance pending this Court's resolution of Plaintiffs' motion to compel the

Appeals Board to rule on Captain Peterman's pending administrative appeal.[2]  *See* Dkt. No. 92.

In an Order dated December 12, 2011, the Court (Scullin, S.J.) granted Plaintiffs' unopposed

motion for an expedited briefing schedule on their motion to hold in abeyance PBGC's

resubmitted motion for partial summary judgment on claim eight; granted Plaintiffs' unopposed

motion to schedule a status conference in this matter; granted Plaintiffs' unopposed motion for an

extension of time within which to file their opposition to PBGC's resubmitted motion for partial

summary judgment on claim eight; and reserved decision on Plaintiffs' motion for an order

holding in abeyance PBGC's resubmitted motion for partial summary judgment on claim eight

---

[2] Plaintiffs apparently want the PBGC to supplement the administrative record, incorporating the documents referenced in Captain Peterman's appeal.

until after the status conference.[3]  *See* Dkt. No. 95.

On January 9, 2012, Plaintiffs filed a "provisional" memorandum in opposition to

PBGC's resubmitted motion for partial summary judgment on claim eight, noting that they

currently had pending two motions related to "the urgency of resolving" Captain Peterman's

administrative appeal and that they were "strongly of the view that the PBGC's motion [was]

premature at this time."[4]  *See* Dkt. No. 99 at 1.  PBGC then filed a reply memorandum in support

of its resubmitted motion for partial summary judgment on claim eight.  *See* Dkt. No. 102.  On

February 7, 2012, Plaintiffs filed an unopposed motion for leave to file a surreply in further

opposition thereto.  *See* Dkt. No. 103.[5]

In their second amended complaint, Plaintiffs asserted twelve claims against PBGC: (1)

failure to comply with ERISA for improper priority categorization of plan provisions

regarding early retirement benefits; (2) failure to comply with ERISA for improper priority

categorization of plan provisions incorporating a federal statutory tax provision; (3) failure to
comply with ERISA for improper calculation of plan liabilities by using unlawful formula; (4)

failure to comply with ERISA for improper calculation of pension benefits due to the use of

---

[3] The Court held a status conference on March 13, 2012.

[4] Plaintiffs contend that this Court should "deny the summary judgment motion without
prejudice, hold proceedings in abeyance pending disposition of Captain Peterman's
administrative appeal, direct the PBGC to resolve Captain Peterman's appeal forthwith, and
permit the parties to file new briefs after Captain Peterman's appeal is decided."  *See* Dkt. No. 99
at 1.  Plaintiffs further contend that, should the Court decide to consider "the PBGC's motion at
this time, the PBGC is still not entitled to judgment as the decision of its Appeals Board as to the
interpretation of the minimum benefit provisions [to which claim eight pertains] is not
sustainable as a matter of law on this record."  *See id.* at 2.

[5] Plaintiffs seek such leave "in order to respond to new factual matters asserted for the
first time in Defendant[] [PBGC's] reply – specifically, PBGC's suggestion that Captain Jerome
Peterman was a party to the consolidated administrative appeal that occurred in 2007 – to which
the Plaintiffs would otherwise have no opportunity to respond."  *See* Dkt. No. 103 at 1.

offsets prohibited by the plan; (5) failure to comply with ERISA for breach of fiduciary duty; (6)

failure to comply with ERISA for failure to honor the plan provision guaranteeing the Piedmont

Aviation Inc. Pilot Retirement Plan's pilots a cost of living adjustment; (7) failure to comply with

ERISA for refusing to allocate benefits by calculating the present value of any benefit as of the

date of the plan's termination; (8) failure to comply with ERISA for miscalculation of the

minimum benefits guaranteed to former Allegheny Airlines (the predecessor to US Airways)

pilots; (9) failure to comply with ERISA for unlawful recoupment; (10) failure to provide

insurance benefits to make up for shortfalls that existed after the distribution of remaining plan

assets; (11) failure to comply with ERISA for arbitrary diminishment and/or failure to honor

longstanding, vested plan provisions guaranteeing disability retirement benefits; and (12)

violations of the Administrative Procedure Act ("APA") for failure to provide Plaintiffs with

benefits guaranteed by ERISA and the Plan.  *See* Dkt. No. 36.

## III. DISCUSSION

**A.    Plaintiffs' motion for summary judgment on claims one, two, three, six, seven, nine, ten, eleven, and twelve and PBGC's cross-motion for summary judgment on those claims as well as on claim four**

### *1. Standard of review*

In its capacity as statutory trustee, PBGC is responsible for administering benefits under

terminated pension plans.  *See* 29 U.S.C. § 1342(d)(1)(B).  PBGC makes determinations for plan

participants who apply to the PBGC for benefits, and participants may challenge those decisions

before the PBGC Appeals Board.  *See* 29 C.F.R. §§ 4003.21, 4003.51.  A decision that the

PBGC Appeals Board renders constitutes PBGC's final agency action.  *See* 29 C.F.R. §

4003.59(b).  As Plaintiffs have done in the instant case, plan participants upset with PBGC's final

determination concerning their benefits under the plan may challenge that determination in federal court.  *See* 29 U.S.C. § 1303(f).  Pursuant to the APA, courts may only set aside final agency actions that the court finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).

Since PBGC is a federal agency subject to the provisions of the APA, *see* 5 U.S.C. §§ 551 *et seq.*, courts generally must defer to PBGC's actions unless the plaintiff demonstrates that the decision was arbitrary or capricious.  *See* 5 U.S.C. §§ 555, 706(2)(A).  Furthermore, to the extent that Plaintiffs' claims challenge PBGC's interpretations of ambiguous provisions of ERISA, those interpretations are entitled to *Chevron* deference.  *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 648 (1990).  This Court (Robertson, J.) previously[6] applied *Chevron* deference to such claims challenging PBGC's statutory interpretations for two reasons:

> First, PBGC – no matter what its role – has "practical agency expertise" that makes it "better equipped" to interpret and apply ERISA than the courts. . . . Second, courts have consistently deferred to PBGC when it is acting solely as a guarantor even though PBGC often has a financial interest in a particular interpretation of ERISA in that role.

*See* Dkt. No. 27 at 4-5 (quotation omitted).

The D.C. Circuit similarly "defer[red] to the PBGC's authoritative and reasonable interpretations of ambiguous provisions of ERISA."  *Davis v. Pension Benefit Guar. Corp.*, 571

---

[6] In a Memorandum Order dated December 2, 2008, the Court (Robertson, J.) denied Plaintiffs' motion for a preliminary injunction.  *See* Dkt. No. 27.  Plaintiffs' preliminary injunction motion focused on three of their eleven claims: claims one, two, and ten.  In its Memorandum Order, the Court analyzed those claims and found, among other things, that Plaintiffs were not likely to succeed on the merits of claims one, two, and ten.  The D.C. Circuit affirmed this Court's denial of a preliminary injunction because Plaintiffs had neither demonstrated a substantial likelihood of success on the merits nor irreparable harm.  *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009).

F.3d 1288, 1293 (D.C. Cir. 2009).  Accordingly, the Court will apply *Chevron* deference to those

claims in which Plaintiffs challenge PBGC's interpretations of ambiguous ERISA provisions.

Under *Chevron*, where Congress has not "directly spoken to the precise question at issue," a

court should proceed to evaluate "whether the agency's [interpretation] is based on a permissible

construction of the statute." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S.

837, 843 (1984) (footnote omitted).

     "In actions under the APA, summary judgment is the appropriate mechanism for

'deciding, as a matter of law, whether the agency action is supported by the administrative record

and otherwise consistent with the APA standard of review.'" *United Steel, Paper & Forestry,*

*Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC v. Pension*

*Benefit Guar. Corp.*, No. 09-517, 2012 WL 917554, *12 (D.D.C. Mar. 20, 2012) (quotation

omitted).  The court shall grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.
R.

Civ. P. 56(a); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986).  In deciding a motion
for

summary judgment, the court must draw all reasonable inferences in favor of the nonmoving

party.  *See Anderson*, 477 U.S. at 255 (citation omitted).

     *2. Claim one*

     In claim one of their second amended complaint, Plaintiffs allege that, in prioritizing

benefits, PBGC erroneously interpreted an ERISA provision that would award additional

benefits to eligible pilots who retired early under an Early Retirement Incentive Program

("ERIP").  The ERISA provision at issue limits Priority Category 3 ("PC-3") — the prioritization

level[7] relevant here — to benefits "based on the provisions of the plan (as **in effect** during the 5-year period ending on [the plan's termination] date) under which such benefit would be the least[.]"  29 U.S.C. § 1344(a)(3)(A) (emphasis added).  Claim one involves a dispute over the date on which ERIP came "in[to] effect," a phrase that is undefined in the statute.

Plaintiffs contend that, although the Plan had sufficient assets to cover the benefits in PC-3 for distribution purposes, PBGC improperly excluded the benefit to those Plan participants who retired early.  PC-3 covers benefits based on provisions that were "in effect" within five years before the Plan's termination date.  The relevant dates are the following: US Airways adopted the ERIP on December 4, 1997; the ERIP included a self-defined effective date of January 1, 1998; the ERIP provided that no pilots could retire or collect payments under the program until May 1, 1998; and the Plan was terminated on March 31, 2003.  PBGC determined that the ERIP was not "in effect" five years before the Plan's termination on March 31, 2003, because, even though the ERIP's self-defined effective date was January 1, 1998, the first date on which pilots could actually retire and become eligible for the benefit, i.e., the first date on which the benefit actually went "in[to] effect," was not until May 1, 1998 — one month too late to be included in PC-3.

Plaintiffs challenge PGBC's "*ad hoc*" interpretation of the ERIP's effective date.  They

---

[7] By way of background necessary for this and several other claims, each Plan participant's benefits are assigned to one or more of six priority categories in ERISA, 29 U.S.C. § 1344(a).  To allocate a plan's assets to those benefits, the benefits in each priority category, if any, must first be valued.  The assets are then allocated, in order, to the priority categories, starting with PC-1.  If the terminated plan's assets are sufficient to pay all PC-1 benefits, the remaining assets are allocated to PC-2, and so on, until either all benefits have been provided or the assets run out in a category.  In the instant case, the most relevant priority category is PC-3.

contend that the provision was expressly made effective on January 1, 1998, and that "the

PBGC's novel interpretation allowed it to disregard the ERIP in paying a certain category of

benefits, thereby saving itself multi-millions of dollars."  *See* Dkt. No. 71 at 17.  PBGC, on the

other hand, argues that its interpretation of the ERIP's effective date is reasonable because PBGC

treats such a program as "in effect" on the date on which it would actually become available to

pilots — that is, when pilots could elect to retire and begin receiving payments under the ERIP,

not on the date on which the program became nominally effective.  Accordingly, PBGC

determined that this provision was only "in effect" on the date Plan participants could retire and

receive the benefit — May 1, 1998 — and that a pilot who retired prior to that date would not

receive the benefit.

PBGC maintains that this interpretation of ERISA is further supported by its own

regulations limiting PC-3 benefits to "the lowest annuity benefit **payable** under the plan

provisions at any time during the 5-year period[.]"  29 C.F.R. § 4044.13(b)(3)(i) (emphasis

added).  The D.C. Circuit held that, because the ERIP "only became operationally effective when

it was first possible for pilots to retire under the program — or even collect payments under it —

it was reasonable for the PBGC to use May 1, 1998 as the date the program came into effect."

*Davis*, 571 F.3d at 1293.

As stated, Plaintiffs contend that the ERIP was "in effect" more than five years before the

Plan's March 31, 2003 termination date.  In support of their assertion, Plaintiffs point to PBGC's

regulation, which provides that a plan amendment "is 'in effect' on the later of the date on which

it is adopted or the date it becomes effective[,]" *see* 29 C.F.R. § 4044.13(b)(6); and, since the

ERIP included a self-defined effective date of January 1, 1998, the ERIP must have been "in

effect" more than five years before termination on March 31, 2003.  Such an interpretation is not

unreasonable.  However, since the meaning of the phrase "in effect" is ambiguous, PBGC's

statutory interpretation need only be "permissible."  The Court defers to the PBGC's

interpretation as a permissible construction of the statute.  *See, e.g.*, *Bean Dredging, LLC v.*

*United States*, 773 F. Supp. 2d 63, 87 (D.D.C. 2011) (stating that "the mere fact that two

inconsistent conclusions can be drawn from the record does not render the agency's decision

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (citation

omitted)).

Accordingly, the Court denies Plaintiffs' motion for summary judgment on claim one and

grants PGGC's cross-motion for summary judgment on claim one.

### 3. Claim two

Claim two, like claim one, challenges PBGC's decision to exclude a benefit from PC-3.

For the five-year lookback period prior to the Plan's termination, the Plan capped maximum

benefits at the level established by Internal Revenue Code ("IRC") § 415(b).  *See* 26 U.S.C.

§ 415(b).  Section 7.1 of the Plan provides that, "[a]s required by ERISA, the maximum amount

of yearly retirement income which may be paid to a Participant under this Plan may not exceed

the limitations contained in Section 415(b) of the IRC . . . ."  *See* Administrative Record ("AR")

at 392.  In 2001, two years before the Plan's termination, Congress amended § 415 to increase

the maximum cap on benefits; and, for the two years preceding termination, the Plan's maximum

cap was correspondingly raised.  The alleged improperly excluded benefit at issue here concerns

certain cost-of-living adjustments ("COLA") to the cap that § 415(b) imposed.

The benefit assigned to PC-3 "is limited to the lesser of the lowest annuity benefit in pay

status during the 3-year period ending on the termination date and the lowest annuity benefit

payable under the plan provisions at any time during the 5-year period ending on the termination

date." 29 C.F.R. § 4044.13(b)(3)(i).  Therefore, as this Court previously held, "any automatic

increases in the three years before termination — including the 2001 increase at issue here — are

rightly excluded from priority category 3." *See* Dkt. No. 27 at 8-9.

For automatic benefit increases, PBGC's regulation provides that "the lowest annuity

benefit payable during the 5-year period ending on the termination date . . . includes the

automatic increases scheduled during the fourth and fifth years preceding termination . . . ." 29

C.F.R. § 4044.13(b)(5).  Thus, PC-3 would include COLAs that went into effect during the

fourth and fifth years before termination as "automatic benefit increases."  However, ERISA and

PBGC's regulations support an interpretation that PC-3 is rightly limited to the benefit in pay

status as of three years before termination or that would have been in pay status if the participant

had retired at that time.  Indeed, as the D.C. Circuit held in determining that Plaintiffs were

unlikely to succeed on this claim, even though the statutory cap was in effect for the entirety of

the five-year period before termination, the amended increase to the maximum cap only occurred

during the final two years.  *See Davis*, 571 F.3d at 1294.

Accordingly, "[t]hough the pilots prefer the higher cap, the statutory text is plainly against

them: Priority Category 3 is 'based on the provisions of the plan (as in effect during the 5-year

period ending on [the plan's termination] date) *under which such benefit would be the least*.'"  *Id.*

(quoting 29 U.S.C. § 1344(a)(3)(A)).  This Court likewise finds that PBGC reasonably based its

final determination on the lower cap because the value of "such benefit would be the least" under

the maximum cap that applied during the first three years, rather than the amended increase that

applied only during the last two years.  For that reason, the Court denies Plaintiffs' motion for summary judgment as to claim two and grants PBGC's cross-motion for summary judgment on claim two.

### 4. Claim three

In the third claim of their second amended complaint, Plaintiffs challenge PBGC's calculation of their expected retirement age for asset distribution purposes and the PBGC Appeals Board's alleged refusal to even consider potential flaws in that calculation.  Plaintiffs essentially challenge PBGC's use of generic tables to calculate their average expected retirement age.[8]

In valuing and allocating participants' entitlement to early-retirement benefits, PBGC must determine Plaintiffs' average expected retirement age.  PBGC has promulgated regulations that establish general assumptions used to make this calculation by way of a formula that includes annually-updated tables.  *See* 29 C.F.R. §§ 4044.55-4044.57.  PBGC contends that, by using and applying this general formula, it "can value early retirement benefits for a plan without gathering plan-specific data or computing a weighted average of the benefit payable at each possible retirement age," which the Court should uphold as a "perfectly reasonable policy choice, reflecting a fully permissible construction of the statute."  *See* Dkt. No. 74 at 51.

_____

[8] Whereas claims one and two (and several others) involve PBGC's calculation of benefits payable to Plan participants who were retired as of three years prior to the Plan's termination or who were retirement eligible at that time — so-called PC-3 benefits — this claim relates only to those pilots who were then not yet retired or retirement eligible.  Generally, a lower expected retirement age results in a higher estimated amount of benefits needed to be paid to eligible participants and vice versa; and, as a plan's estimated benefit liability increases, the benefits payable to participants decreases.

Plaintiffs contend that PBGC must make a particularized, Plan-specific expected retirement age estimation for them.  Plaintiffs assert that, although PBGC's generic tables "may well prove adequate in the great bulk of cases that come before the PBGC," it is "incapable of accurately estimating the average expected retirement age of commercial airline pilots, who have a number of unique incentives to continue working until the mandatory retirement age that has long been established by federal law."  *See* Dkt. No. 71 at 48.  It is Plaintiffs' position that "PBGC's, and specifically the Appeals Board's, refusal to do anything but rigidly apply the regulation [29 C.F.R. §§ 4044.55-4044.57] constitutes arbitrary and capricious agency action." *See id.* at 49 (footnote omitted).

Plaintiffs assert that PBGC blindly rejected their proposed alternative without taking a hard look at their concerns and, in doing so, arbitrarily adhered to the generic calculation of their expected retirement age, which falls short of reasoned decision-making.  However, affording PBGC the deference that it is unquestionably due on this claim with respect to its decision to adopt a rule of general applicability and its application of that regulation, *see Lopez v. Davis*, 531 U.S. 230, 243-44 (2001) (quotation and other citation omitted), the Court denies Plaintiffs' motion for summary judgment on claim three and grants PBGC's cross-motion for summary judgment on claim three because PBGC's statutory interpretation is reasonable.

### 5. Claim six

In their sixth claim, Plaintiffs challenge PBGC's application of a Plan provision specific to those pilots formerly employed by Piedmont Aviation Inc. ("Piedmont Pilots") before its merger with US Airways.  Plaintiffs contend that, in allocating PC-3 benefits, PBGC improperly left out COLAs payable to the Piedmont Pilots.  Claim six, like claim two, deals with PBGC's

-14-

"automatic benefit increase" regulation under § 4044.13(b)(5).  Section 17.5(C) of the Plan

provides that retired Piedmont Pilots would receive a COLA that increases their benefits by a

certain percentage on the first of January every year after their retirement.  As it did with

Plaintiffs' second claim, PBGC applied its automatic-benefit-increase regulation, 29 C.F.R.

§ 4044.13(b)(5), to the COLA payable under Plan § 17.5(C).[9]

Plaintiffs first contend that PBGC erred in excluding the Piedmont Pilots' COLAs in the

three years prior to Plan termination, *i.e.*, in paying COLAs in 1999 and 2000 but excluding

COLAs from its PC-3 calculations in 2001, 2002, and 2003.  For the reasons stated above with

respect to claim two, the Court finds that PBGC reasonably determined that benefit increases

subsequent to the January 1, 2000 COLA were not "in effect" three years before the Plan's

termination date.

The Court finds that PBGC permissibly interpreted its regulation to provide that each

COLA is itself an automatic benefit increase that becomes effective when the benefit increase

actually goes into effect, *i.e.*, the first date on which the pilots became eligible for the benefit;

and, insofar as the COLAs are an automatic increase within the three years before the Plan's

termination, they are excluded from PC-3 because, again, "the lowest annuity benefit payable

during the 5-year period ending on the termination date . . . includes the automatic increases

scheduled during the fourth and fifth years preceding termination . . . ."  29 C.F.R.

---

[9] Whereas Plaintiffs argue in claim two that § 4044.13(b)(5) does not apply to the Plan provision at issue in claim two (and that, even if it did, the regulation is contrary to ERISA and should be set aside), Plaintiffs concede § 4044.13(b)(5) applies to Plan § 17.5(C) — the Plan provision at issue in claim six.  *See* Dkt. No. 76, Plaintiffs' Reply Memorandum, at 33.  In claim six, Plaintiffs argue that ERISA does not support 29 C.F.R. § 4044.13(b)(5) and that the regulation must be set aside.  *See id.* (citing 5 U.S.C. § 706(2)(A)).

§ 4044.13(b)(5).  Thus, although PC-3 includes COLAs that went into effect during the fourth and fifth years preceding termination, the Court finds that PBGC permissibly determined that any subsequent COLAs were not in effect as of three years prior to the Plan's termination and thus permissibly excluded the benefit from PC-3.

Furthermore, Plaintiffs contend that PBGC improperly applied its overly-broad "phase-in" regulation, 29 C.F.R. § 4022.25(b), in determining the guaranteed benefits of "at least two" Piedmont Pilots.  ERISA provides that benefit increases are subject to a five-year phase-in guarantee of "any increase in the amount of benefits under a plan resulting from a plan amendment which was made, or became effective, whichever is later, within 60 months before the date on which the plan terminates," *see* 29 U.S.C. § 1322(b)(1)(B), and that such benefits are guaranteed only to the extent of 20% of the increase, or $20 per month, "multiplied by the number of years (but not more than five) the plan or amendment, as the case may be, has been in effect[,]" *see* 29 U.S.C. § 1322(b)(7).  PBGC's corresponding regulation provides that the phase-in of the guarantee is determined based on "the number of years the benefit increase has been in effect, not to exceed five, multiplied by the greater of (1) 20 percent of the amount computed . . . or (2) $20 per month[,]" *see* 29 C.F.R. § 4022.25(b), and that "a benefit increase is deemed to be in effect commencing on the later of its adoption date or its effective date[,]" *see* 29 C.F.R. § 4022.24(e).

Plaintiffs assert that PBGC's phase-in regulation is impermissibly overbroad as it is significantly more restrictive than ERISA's phase-in provision.  Plaintiffs contend that PBGC's phase-in regulation should not be applied to a Plan amendment that has been in effect more than five years prior to the Plan's termination (that is, Plan § 17.5(C) providing for the Piedmont

Pilots' COLAs that was adopted well before the 5-year pre-termination period) because ERISA provides that benefit increases are subject to the phase-in only where the increase stems from a *plan amendment* not adopted or effective within five years of the plan's termination, rather than *all benefit increases* that have been in effect for less than five years.  *See* Dkt. No. 76, Plaintiffs' Reply Memorandum, at 36-37 (citing 29 U.S.C. §§ 1322(b)(1)(B), (b)(7)).[10]

However, in applying its own corresponding regulation, PBGC determined that ERISA provides that each COLA constitutes a benefit increase that only becomes "effective" at the time the increase is actually payable; and, since Plan § 17.5(C) increased the benefits of the Piedmont Pilots on January 1 of each year, each COLA was a benefit increase that only became effective when the increase actually went into effect on January 1 of each year in question.  *See* Dkt. No. 78, PBGC's Reply Memorandum, at 18-19.[11]

Although PBGC's longstanding phase-in regulation is perhaps broader in certain circumstances than ERISA's provision, the Court finds that the regulation is not clearly contrary to ERISA's phase-in provision.  As in claim two, the Court defers to PBGC's interpretation as a permissible construction of the statute.  Since the Court concludes that Plaintiffs have failed to show any arbitrary or capricious agency action, the Court denies Plaintiffs' motion for summary

---

[10] To be sure, ERISA does state that its phase-in rule applies to "any increase in the amount of benefits under a plan resulting from a **plan amendment** which was made, or became effective, whichever is later," within five years of the plan's termination date.  29 U.S.C. §§ 1322(b)(1)(B), (b)(7) (emphasis added).

[11] Furthermore, PBGC's regulations define "benefit increase" as "any benefit arising from the adoption of a new plan or an increase in the value of benefits payable arising from an amendment to an existing plan.  Such increases include . . . a scheduled increase in benefits under a plan or plan amendment, **such as a cost-of-living increase** . . . ."  29 C.F.R. § 4022.2 (emphasis added).

judgment on claim six and grants PBGC's cross-motion for summary judgment on claim six.

### 6. Claim seven

Plaintiffs' seventh claim concerns the proper way in which to calculate the PC-3 benefits of participants who were eligible to retire three years before the Plan's termination, *i.e.*, as of April 1, 2000, but instead chose to defer retirement and to continue working past that date. Plaintiffs contend that PBGC must calculate those participants' benefits by applying principles of "actuarial equivalence" — that is, for pilots who were not retired three years before termination but were eligible to retire at that time, the statutory benefit amount must at least match what it would have been had they retired at that time.  PBGC contends that neither ERISA nor its own implementing regulations provide for such a requirement.  PBGC determined that PC-3 was properly calculated by fixing the benefit amount as of three years before termination and that ERISA does not require any actuarial increase to the benefits of participants who were eligible to retire three years before termination but retired later.

As previously discussed, PC-3 includes benefits payable to participants who were retired or eligible to retire as of three years before the Plan's termination date.  *See* 29 U.S.C. § 1344(a)(3).  For a retired participant as of the beginning of the three-year period, the benefit is the amount "which **was in pay status** as of the beginning of the 3-year period ending on the termination date of the plan (**as in effect** during the 5-year period ending on such date) under which such benefit would be the least[.]"  29 U.S.C. § 1344(a)(3)(A) (emphasis added).  For a non-retired participant who was eligible to retire at least three years before the Plan's termination, the PC-3 benefit is the amount

which **would have been in pay status** as of the beginning of such

-18-

> 3-year period **if the participant had retired** prior to the beginning
> of the 3-year period and if his benefits had commenced (in the
> normal form of annuity under the plan) as of the beginning of such
> period, to each such benefit based on the provisions of the plan (**as
> in effect** during the 5-year period ending on such date) under
> which such benefit would be the least.

29 U.S.C. § 1344(a)(3)(B) (emphasis added).  PBGC construed this statutory language to mean that PC-3 benefits are a fixed amount determined as of the date three years before the Plan's termination.

PBGC contends that nothing in the statute suggests that this purportedly fixed amount must be actuarially increased if a participant defers retirement; Plaintiffs, on the other hand, contend that PC-3 benefits are *not* "fixed" at three years before the Plan's termination.  Plaintiffs argue that "[t]he obvious purpose of separately identifying those two groups [retired and non-retired participants] is to ensure that their PC3 benefits would be assessed differently to account for their different circumstances -- in this case, for example, that the PC3 benefits of retirement-eligible pilots did not commence until later than April 1, 2000."  *See* Dkt. No. 76 at 41.  The Court finds that PBGC's statutory interpretation should be upheld.

ERISA expressly provides that the PC-3 benefit for a retirement-eligible participant is the amount that "would have been in pay status as of the beginning of such 3-year period if the participant had retired . . . and if his benefits had commenced" at that time.  29 U.S.C. § 1344(a)(3)(B).  Accordingly, the Court finds that the benefit is a fixed amount, determined as of the date three years before the Plan's termination.

The next question is whether or not the statute mandates an actuarial adjustment to the benefit amount of participants who were eligible to retire three years before termination but chose not to do so.  Plaintiffs point to PBGC's own regulations to support their argument for

-19-

actuarial increases; PBGC's regulations use "actuarial assumptions" (such as interest rates, mortality rates, and expected retirement ages) to determine the present value of benefits in a certain priority category. *See* 29 C.F.R. §§ 4044.41-4044.57.  PBGC counters that, although its regulations state that PBGC should use *valuation* formulas "that accord with generally accepted actuarial principles and practices[,]" *see* 29 C.F.R. § 4044.52(c), claim seven concerns what benefit amount is payable to participants who could have retired three years before termination but deferred retirement, not how to compute the present value of that PC-3 benefit, *see* Dkt. No. 74 at 50.[12]

The Court finds that Plaintiffs have offered no legitimate reason to upset PBGC's interpretation of its own regulations and ERISA as providing that retirement-eligible participants as of three years before the Plan's termination date were entitled to a fixed benefit amount as of that date, without any actuarial adjustment.  Since this constitutes a reasonable interpretation of the statute, the Court denies Plaintiffs' motion for summary judgment on claim seven and grants PBGC's cross-motion for summary judgment on claim seven.

_____

[12] This distinction can be confusing.  Each participant's benefits are assigned to a priority category.  To allocate a plan's assets to those benefits, the benefits in each priority category must first be *valued*.  The assets are then allocated to the priority categories.  In this case, PBGC determined that the Plan had total assets of $1.19 billion at the time of termination.  PBGC determined that the total value of PC-3 benefits was $1.15 billion based on those "actuarial assumptions" contained in its own regulations.  PBGC explains that, "to determine the present value of PC3 benefits as of the termination date, PBGC applies these actuarial assumptions to the fixed amount of the PC3 benefit — the amount that 'would have been in pay status' as of the date three years before termination if the participant had retired then.  This fixed amount is not actuarially increased." *See* Dkt. No. 78 at 24.  So, in order to allocate and distribute a terminated plan's assets to a participant's PC-3 benefit, while PBGC uses "actuarial principles and practices" to determine the present value of a PC-3 benefit, that benefit is the fixed amount in PC-3, not an actuarially-adjusted benefit as ERISA requires no such adjustment.

### 7. Claim nine

Plaintiffs contend that they are entitled to summary judgment on their ninth claim because ERISA does not authorize PBGC's recoupment and recovery regulations.  PBGC contends that it is clearly authorized to collect *post*-termination overpayments from Plan participants and that its authority to collect those amounts is not governed by the restrictions contained in 29 U.S.C.      § 1345, which, it argues, applies only to the collection of *pre*-termination payments.  Plaintiffs, on the other hand, contend that § 1345 is the only relevant statutory provision as it speaks to the ability of a plan trustee to recover overpayments.  Plaintiffs argue that, because § 1345 bars PBGC from recovery in all cases in which the participant is disabled and also authorizes PBGC to waive recovery in cases of economic hardship, *see* 29 U.S.C. § 1345(c), PBGC should have waived recovery of certain Plan participants' alleged overpayments.

Section 1345 of Title 29 of the United States Code provides that "the trustee is authorized to recover for the benefit of a plan from a participant the recoverable amount . . . of all payments from the plan to him which commenced within the 3-year period immediately preceding the time the plan is terminated." 29 U.S.C. § 1345(a).  The Court agrees with PBGC's contention that this language makes clear that § 1345 applies only to *pre*-termination payments.  Moreover, PBGC's regulations state that it may recover and recoup overpayments.  *See* 29 C.F.R. § 4022.81.  In challenging that regulation and its application in the instant case, Plaintiffs argue that this governmental right to recover funds is implicated only where "governmental" funds are involved; and, here, in contrast, PBGC acted as a trustee, not as an agent of the United States administering federal funds.  However, this distinction is not compelling.  Indeed, the D.C.

-21-

Circuit has held that PBGC enjoys "[t]he government's right to recoup funds owing to it . . . ." *Bechtel v. Pension Benefit Guar. Corp.*, 781 F.2d 906, 907 (D.C. Cir. 1985) (citation omitted).[13]

As with all of Plaintiffs' supposed challenges to measures PBGC adopted by regulation, courts owe substantial deference to its interpretations of its own regulations as long as the regulation represents a reasonable policy choice. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *see also Broward v. United States*, No. 05-01774, 2006 WL 1827733, *3 (D.D.C. July 3, 2006) (citation omitted). Accordingly, and for the reasons stated above, the Court finds PBGC's recoupment regulation and its application thereof to be a reasonable interpretation of ERISA; and, thus, the Court denies Plaintiffs' motion for summary judgment on claim nine and grants PBGC's motion for summary judgment on claim nine.

### 8. Claim ten

In claim ten, Plaintiffs allege that PBGC failed to provide sufficient funds to the Plan to make up for its obligation to guarantee the payment of all guaranteed benefits. ERISA provides that PBGC "shall guarantee . . . the payment of all nonforfeitable benefits[,]" *see* 29 U.S.C. § 1322(a), subject to certain limitations such as the cap on a participant's guaranteed monthly benefit, *see* 29 U.S.C. § 1322(b). The statute does not explain whether the specified amount is the amount a participant is guaranteed to receive (as PBGC argues) or whether it is the amount PBGC is obligated to pay (as Plaintiffs argue). PBGC interpreted the statute to mean the minimum amount that a participant is guaranteed to receive, not a minimum expenditure of its

---

[13] Plaintiffs contend that *Bechtel* was wrongly decided and that "more recent developments in ERISA jurisprudence demonstrate that the PBGC cannot rely on an implied cause of action under ERISA." *See* Dkt. No. 76 at 46-47.

insurance funds — that is, ERISA ensures a floor, and PBGC will make up the difference if a

participant receives from plan assets an amount below that floor.  Since this claim involves

another matter of statutory interpretation, PBGC is entitled to *Chevron* deference.

Plaintiffs contend that, because the Plan was underfunded at the time of termination and

its assets did not cover all of their nonforfeitable benefits, PBGC was

> required to "guarantee the payment" of the remaining non-
> forfeitable benefits not covered by the Plan's assets, up to ERISA's
> maximum guaranteeable benefit.  But the PGBC found that if a
> Pilot had already been allocated from the Plan's assets more than
> ERISA's maximum guaranteeable benefit -- even if that amount
> was substantially less than the total amount of the Pilot's non-
> forfeitable benefits to which he is entitled under the Plan -- it owed
> not a penny of insurance. . . . The PBGC must pay insurance
> *whenever* the assets of a plan are insufficient to cover a
> participant's non-forfeitable benefits.  The PBGC is not absolved
> of its insurance obligation when a participant receives from the
> plan's assets more than the maximum guaranteeable benefit.

*See* Dkt. No. 71 at 78.  In denying Plaintiffs' motion for a preliminary injunction on this claim,

the Court concluded that there was "no support in ERISA for the plaintiffs' position."  *Davis*, 596

F. Supp. 2d at 5, *aff'd,* 571 F.3d 1288, 1294.

Plaintiffs contend that PBGC must first allocate a plan's assets and only then calculate the

guaranteed benefits, whereas PBGC contends that it must calculate guaranteed benefits before

allocating a plan's assets.  PBGC asserts that, "[i]n paying benefits for the past 35 years, [it] has

followed the ordinary meaning of 'guarantee': that PBGC ensures a floor, so that each participant

will receive at least the minimum benefit prescribed in the statute."  *See* Dkt. No. 74 at 64

(footnote omitted).  To be certain, Plan participants can sometimes receive more than their

guaranteed benefits.  In this case, the Plan terminated with enough assets to provide participants

their guaranteed benefit amount.  Since the Plan's assets could provide the guaranteed amount,

the Court finds that PBGC reasonably construed the statute to mean that it did not need to reach

into its insurance funds to supplement those benefits.  Therefore, the Court denies Plaintiffs'

motion for summary judgment on claim ten and grants PBGC's motion for summary judgment on

claim ten.

### 9. Claim eleven

In claim eleven, Plaintiffs challenge PBGC's interpretation of the disability retirement

benefit provision[14] in section 4.1(E) of the Plan guaranteeing supplemental retirement income to

a participant who "begins receiving disability benefits under the Additional Benefit Programs on

or after December 1, 1974, and who is determined to be totally and permanently disabled . . . ."

See AR at 387.  Plaintiffs challenge the PBGC Appeals Board's denial of disability retirement

benefits to certain Plan participants, arguing that PBGC

> (1) unreasonably discarded important procedures and practices
> utilized by the previous Retirement Plan administrator for
> determining entitlement to T & P [totally and permanently
> disabled] retirement benefits, (2) added unwarranted substantive
> hurdles to securing those benefits, (3) ignored the failure of the
> previous plan administrator to properly apply and/or advise
> participants about the T & P retirement benefit provision, and (4)
> made errors in allocating priority to T & P retirement benefits
> when dividing up the remaining assets of the Plan.

See Dkt. No. 76 at 55.  The Court addresses these challenges in the order in which Plaintiffs

raised them.

### a. Total and permanent disability determinations

_____

[14] This is to be distinguished from the disability retirement provision contained in the
Prior Plan, which is at issue in claim eight and analyzed below.

First, Plaintiffs contend that PBGC erred in eliminating important procedures that the pre-termination Plan administrator used to determine a participant's entitlement to total and permanent disability benefits.  By way of background, before the Plan's termination, the administrator offered pilots several ways in which to qualify as "totally and permanently disabled" in order to get the additional benefit.  Relevant here is the US Airways Pilots' Disability Plan ("Disability Plan") under which disability determinations are made, an ongoing plan separate and distinct from the (pension) Plan at issue in this litigation.  The Disability Plan, unlike the Plan, provides disability benefits more broadly, the amount of which increases if a participant is deemed "Permanently and Totally Disabled."  Plaintiffs now contend that PBGC improperly denied their request to make disability determinations in a similar manner.  Contrary to Plaintiffs' apparent frustration with PBGC's method for making these determinations, however, the PBGC Appeals Board actually held that it would *continue* the practice of deferring to formal disability determinations made under the *Disability Plan*.  *See* Dkt. No. 72 at DAR 12. Further, "to expedite processing of the [participants'] cases in a manner that is fully consistent with the Disability Plan's practice," the PBGC Appeals Board held that it "would accept the SSA awards as establishing that the medical requirements for T & P disability were met."  *See id.* at DAR 11.  The Court finds that PBGC acted reasonably in interpreting and applying the available procedures for determining total and permanent disability status.

### b. Whether a pilot must begin receiving total and permanent disability benefits before retiring to qualify for the Plan's disability retirement benefit

Plaintiffs contend that PBGC improperly hindered a participant's ability to secure disability retirement benefits by construing the additional benefit as being limited to those totally

and permanently disabled participants who retired while receiving disability benefits.  As stated,

the eligibility provision of the Plan provides a disability retirement benefit to a participant who

"**begins receiving** disability benefits under the Additional Benefit Programs[15] on or after

December 1, 1974, **and** who is determined to be **totally and permanently disabled** . . . ."  *See*

AR at 387 (emphasis added).  Consistent with the supposed plain meaning of that Plan provision,

PBGC has been paying disability retirement benefits to only those participants who satisfy both

prongs of the Plan's apparent two-part test.

Plaintiffs, however, note that the Plan sets the benefit at a level based on what the

participant "was **entitled** to receive under the Additional Benefit Programs," *see id.* (emphasis

added), which, they argue, tends to establish that enrollment in the Additional Benefit Programs

was *not* an eligibility requirement for disability benefits because being "entitled to receive"

expressly contemplates an individual who was not actually receiving disability benefits but

instead "entitled" to them.

This Plan provision is ambiguous.  Under PBGC's construction, Plaintiffs state that "a

pilot who became 'totally and permanently' disabled in a plane, automobile or other crash, or in

some other sudden fashion, [would be deemed] ineligible for the T & P retirement benefit

because he would not have received disability payments prior to the onset of T & P disability."

*See* Dkt. No. 76 at 62.  This is not an entirely fair characterization, as PBGC construed the Plan

provision to require only that a totally and permanently disabled participant begin receiving total

and permanent disability benefits before his or her retirement.  In any event, even if this Court

---

[15] Additional Benefit Programs are "programs of disability benefits and survivor benefits
to be provided to members of the Association by the Employer pursuant to the [Collective
Bargaining] Agreement" between US Airways and the Pilots' union.  *See* AR at 377.

might construe the provision otherwise, the Court defers to PBGC's interpretation because it at least constitutes a permissible plain meaning construction of section 4.1(E) of the Plan.

### c. Breach of fiduciary duty

Plaintiffs contend that PBGC unlawfully refused to take reasonable efforts to ensure that those participants entitled to a disability retirement benefit actually received that benefit.  Even if the Plan requires a totally and permanently disabled participant to begin receiving disability benefits before retiring, Plaintiffs assert that "US Airways at the very least had a duty to inform them of this policy at a time when participants could have chosen to invoke their rights under the long-term disability plan rather than retire immediately."  *See* Dkt. No. 76 at 63.  By not disclosing such material information, Plaintiffs argue, PBGC breached its fiduciary duty.

PBGC denies that it violated any fiduciary duty with respect to notifying totally and permanently disabled participants that they needed to go on disability before retiring to be eligible for the disability retirement benefit.  The Court finds that Plaintiffs have failed to meet their burden to demonstrate that US Airways' previous Plan administrator breached a fiduciary duty to notify the pilots of the way in which the administrator construed Plan § 4.1(E) or that PBGC breached any fiduciary obligations after taking over as Plan trustee.

### d. Whether PBGC improperly construed ERISA and its regulations in allocating remaining Plan assets by not including the disability benefit in PC-3

Finally, Plaintiffs contend that PBGC unreasonably classified disability retirement benefits when dividing up the remaining assets of the Plan.  They first assert that PBGC improperly excluded from PC-3 the benefit for individuals who became totally and permanently

disabled within three years before the Plan's termination, *i.e.*, on or after March 31, 2000.  As

discussed, PC-3 includes benefits payable to participants who were retired or eligible to retire as

of three years before the Plan's termination.  *See* 29 U.S.C. § 1344(a)(3).  As such, however,

PC-3 necessarily excludes participants who became disabled *during* that three year pre-

termination period as those individuals could not have actually received the benefit as of three

years before the Plan's termination.  PBGC aptly summarizes that "[a]n essential condition for

the benefit – being disabled – hadn't occurred yet . . . . Thus, the disability benefit would not

have been – and could not have been – paid as of three years termination, as the Appeals Board

ruled."  *See* Dkt. No. 74 at 44 (citing AR 13-14).

Plaintiffs further contend that PBGC unreasonably refused to afford PC-3 status to the

3% annual increase for disabled pilots guaranteed after March 31, 2000.  Construing this as a

benefit increase, PBGC applied its automatic-benefit-increase regulation, 29 C.F.R. §

4044.13(b)(5), and excluded these supplements from PC-3.  For the reasons discussed above

with regard to PBGC's decision to exclude the Piedmont Pilots' COLAs from PC-3 in the three

years prior to the Plan's termination — that is, in paying COLAs in 1999 and 2000, but

excluding COLAs from its PC-3 calculations in 2001, 2002, and 2003 — the Court likewise

finds that PBGC reasonably interpreted ERISA and its own regulations so as to include only PC-

3 disability benefit increases in the fourth and fifth years before the Plan's termination in 2003.

For all of these reasons, therefore, the Court denies Plaintiffs' motion for summary

judgment on claim eleven and grants PBGC's cross-motion for summary judgment on claim

eleven.

### 10. Claim twelve

-28-

In claim twelve, Plaintiffs allege violations under the APA.  In their reply memorandum, however, Plaintiffs concede that they

> agree with PBGC that this case was brought under ERISA, not the Administrative Procedure Act.  Claim Twelve was brought solely as a protective claim, in case the PBGC sought to argue that this case was not cognizable under ERISA.  Since the parties are in agreement on this point, there is no need for the Court to reach Claim Twelve if it grants summary judgment under ERISA.

*See* Dkt. No. 76 at 1 n.1.

Since ERISA provides the remedy that Plaintiffs seek, the Court dismisses claim twelve because Plaintiffs have abandoned that claim and because it is moot.

## 11. Claim four

Plaintiffs did not move for summary judgment on claim four but, instead, sought to reserve their right to move for summary judgment at a later time depending upon the Court's resolution of the other pending claims.  PBGC, however, contends that claim four is ripe for adjudication and that it is entitled to summary judgment on this claim.

In claim four, like claim eleven, Plaintiffs challenge PBGC's interpretation of a provision in section 4.1 of the Plan.  Specifically, Plaintiffs challenge PBGC's decision to use benefits received by participants under the Target Benefit Plan — a separate plan that US Airways established in 1983 to ameliorate the effect of certain benefit limitations — to offset the benefits to which participants were entitled.  Plaintiffs contend that, because the PBGC Appeals Board "reserved the right to use benefits received under the Target Plan to offset participant benefits under the Plan in all circumstances, even where such an offset would contradict the intent and plain language of the Collective Bargaining Agreement (the 'CBA') pursuant to which the Target

Plan was created," any such potential reductions to a Plan benefit would be improper; and, "[i]f and when that happens, Claim Four will be ripe for decision, and Plaintiffs will immediately move for summary judgment, just as the Federal Rules permit."  *See* Dkt. No. 76 at 67-68 (citations omitted).

PBGC contends that, to the extent a participant had a Target Plan benefit, that benefit has already been accounted for in determining the participant's benefit under the Plan; and, as such, no further offsets would or could apply regardless of the outcome of Plaintiffs' other claims — that is, even if a participant's benefit is increased by virtue of this litigation, PBGC would not offset that benefit by any Target Plan benefit because such benefit has already been accounted for.  *See* Dkt. No. 78 at 36.  Accordingly, since Plaintiffs have failed to meet their burden to demonstrate that PBGC's interpretations of the statute and its regulations were unreasonable or that PBGC's benefit determinations were inadequate, the Court grants PBGC's motion for summary judgment with regard to claim four.

**B.      Cross-motions for partial summary judgment on claim eight for failure to comply with ERISA by miscalculating minimum benefits guaranteed under the Plan**

On September 30, 2011, the Court denied without prejudice the parties' cross-motions for summary judgment on claim eight, finding that Plaintiffs' improper reliance on extra-record materials prevented the Court from fairly and effectively adjudicating the merits of the motions. *See* Dkt. No. 83 at 12.  The Court stated that the parties could resubmit their motions and briefs, citing "only to the administrative record lodged by PBGC."  *See id.* at 13.  On December 2, 2011, PBGC resubmitted its motion for partial summary judgment on claim eight.

In claim eight, Plaintiffs allege that PBGC erroneously interpreted the Plan's "minimum

benefit provision," which, in short, guaranteed participants who were beneficiaries of the Prior

Plan (the Plan's predecessor), the greater of (1) the normal fixed benefit provided by the current

Plan or (2) "that to which he would have been entitled . . . had the Prior Plan continued in effect

without change," with certain adjustments.  *See* Dkt. No. 82 at 1-2.

PBGC first asserts that

> [Plaintiffs] abruptly began summary judgment proceedings on the
> "minimum benefit" issue of Claim 8 in March 2010.  Nearly two
> years later, after Judge Kennedy barred [Plaintiffs] from relying on
> documents outside the administrative record, [Plaintiffs] have
> reversed field.  They now demand that judicial review await
> additional administrative proceedings by which they seek to inject
> into the record the same materials they failed to submit in their
> original agency appeal.

*See* Dkt. No. 102 at 1.  Furthermore, "[c]onsistent with well-established principles of judicial

review and Judge Kennedy's order, PBGC seeks only to have the Court review the agency's

determination based on the documents that were before the agency at the time of its ruling."  *See*

*id.*

Accordingly, PBGC asserts that the Court should deny Plaintiffs' attempt to put before

the Court documents that they could have submitted years earlier, as Judge Kennedy "firmly

rejected the notion that 'parties may remedy their own procedural errors by offering evidence to

the Court that they neglected to produce below.'"  *See id.* at 1-2 (quoting Dkt. No. 82 at 10).  As

such, PBGC contends that its motion for summary judgment on claim eight is ripe for decision

because PBGC "followed Judge Kennedy's instruction to resubmit the motion citing only to the

administrative record."  *See id.* at 4.  Finally, PBGC contends that the Court should grant its

motion for partial summary judgment on claim eight because its interpretation of the

administrative record is supported by the plain language of the Plan and is consistent with the

way in which US Airways has consistently interpreted and operated under the Plan.

Plaintiffs contend that their opposition to PBGC's motion for partial summary judgment on claim eight is entirely "provisional" in that they currently have pending two motions related to the alleged urgency of resolving Captain Peterman's administrative appeal; and, thus, the Court should find that PBGC's motion is premature.[16]  *See generally* Dkt. Nos. 99 & 103.

In its Memorandum Opinion and Order dated September 30, 2011, the Court held that its review was limited to determining whether PBGC's decision was arbitrary, capricious, or an abuse of discretion within the meaning of the APA; that it would not reverse PBGC's determination unless, in making that determination, it had "'relied on factors which Congress ha[d] not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that [ran] counter to the evidence before the agency, or [was] so implausible that it could not [have been] ascribed to a difference in view or the product of agency expertise,'" *see* Dkt. No. 82 at 4-5 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); and that it would not consider circumstances external to PBGC's decision-making process in order to determine whether bias had tainted an otherwise-reasonable conclusion.  *See id.* (other citations omitted).

Furthermore, the Court held that its review was restricted to the administrative record that PBGC had filed.  *See id.* at 3.  In summation, the Court held that,

> for whatever reason, plaintiffs did not provide all of the evidence
> supporting their position with their appeal.  The Board, for
> whatever reason, chose to act on the evidence before it and not to

---

[16] Plaintiffs contend that, once the PBGC Appeals Board "decides Captain Peterman's appeal, the PBGC cannot escape its obligation to supplement the record with the documents referenced therein, regardless of Judge Kennedy's prior ruling."  *See* Dkt. No. 97 at 4.

> hold a hearing.  The Board did not contravene any regulations by doing so.  Plaintiffs may have been legitimately surprised by the Board's course of action, but plaintiffs' own choice to withhold evidence at the agency level — whether tactical, labor-saving, or otherwise — does not provide a basis to allow the introduction of extra-record evidence during judicial review.

*See id.* at 11.[17]

The instant case involves this Court's review of the PBGC Appeals Board's determinations rendered based on the administrative record before it.  The Court finds that Plaintiffs cannot inject into the record materials that were not before the PBGC at the time it rendered its determination.  *See Pension Benefit Guar. Corp. v. WHX Corp.*, No. 03 Civ. 1553, 2003 WL 21018839, *2 (S.D.N.Y. May 6, 2003) (explaining that PBGC's decision to terminate a pension plan was subject to judicial review under an arbitrary and capricious standard and that such review was limited to a review of the administrative record that preceded and culminated in that decision (citation omitted)).  Accordingly, the Court denies Plaintiffs' motion insofar as they seek to hold in abeyance PBGC's resubmitted motion for summary judgment on claim eight.

The next issue for the Court to decide is whether PBGC acted reasonably based on the record before it.  In claim eight, Plaintiffs challenge PBGC's interpretation of the "minimum

---

[17] The Court held that the following materials were not properly before it: (1) fourteen documents that were part of the court record in *Everett v. US Air Grp., Inc.*, 927 F. Supp. 478 (D.D.C. 1996), *aff'd*, 194 F.3d 173 (D.C. Cir. 1999), a case in which pilots sued regarding the proper interpretation of the minimum benefit provision; (2) two documents from Standard & Poor's ("S&P") regarding the S&P equity indices, which are relevant to the instant case because the minimum benefit provision relies on the performance of the S&P 500 to determine benefits; (3) the declaration of Seth Schofield, former CEO of US Airways, in which he describes the 1972 negotiations that led to the creation of the Plan and, of course, the minimum benefit provision; and (4) the declaration of one of the individual pilots, Thomas G. Davis, in which he describes the 1972 negotiations, the *Everett* litigation, and the PBGC appeal.  *See* Dkt. No. 82 at 6-12.

benefit provision" in section 4.1(E) of the Plan.  That provision generally guarantees former

Allegheny Airlines pilots the greater of either the normal fixed benefit under the Plan or the

amount to which they would have been entitled had the Prior Plan continued in effect without

change.  Plaintiffs challenge the PBGC Appeals Board's determinations with regard to claim

eight on several grounds.

### 1. Reinvestment dividends

Section 4.1(E) of the Plan provides that PBGC must calculate the minimum benefit using

"the investment performance of the Standard and Poor's 500 stock index (**unadjusted for**

**dividends**)."  *See* AR at 386 (emphasis added).  The PBGC Appeals Board interpreted this

phrase to refer to "the value of the S&P 500 without taking into account the added return an

investor would receive based on the reinvestment dividends paid by the S&P 500 companies."

*See* AR at 33-34.  Plaintiffs assert that reinvestment dividends must be included and that the

unadjusted-for-dividends modifier "simply reaffirms that 'dividends' should not be 'adjusted' out

of the 'investment performance,' as they are when the S&P 500 Price Index is calculated."  *See*

Dkt. No. 99 at 39.

Since the meaning of "the investment performance of the Standard and Poor's 500 stock

index (unadjusted for dividends)" is ambiguous, the Court finds that PBGC reasonably construed

this Plan provision to mean simply that, in paying benefits, PBGC need not include any

adjustment for reinvestment dividends.

### 2. Post-retirement benefit adjustments

Plaintiffs challenge PBGC's determination to exclude "post-retirement tracking," *i.e.*

post-retirement benefit increases, in making minimum benefit calculations.  Unlike the Prior

Plan, which expressly provided for bi-yearly post-retirement benefit adjustments, § 4.1(E) of the

current Plan makes no mention of post-retirement adjustments; and, primarily for that reason, the

PBGC Appeals Board determined that it need not make any post-retirement adjustments.

Plaintiffs, on the other hand, assert that

> there was *no need* for Section 4.1(E) to mention post-retirement
> adjustments, or any other provision of the Prior Plan.  By stating
> that the benefits of Prior Plan Pilots "shall not be less" than under
> the Prior Plan if kept in effect "without change," Section 4.1(E)
> compels the administrator simply to refer back to the *unchanged*
> Prior Plan -- with all of its provisions -- to perform the minimum
> benefit calculation.

*See* Dkt. No. 99 at 29.

Section 4.1(E) of the Plan guarantees that any former Allegheny Airlines pilot shall not

receive minimum benefits in an amount less than "the amount to which he would have been

entitled at his Benefit Commencement Date or Termination of Employment had the [Prior] Plan

continued in effect without change."  *See* AR at 386.  From this language, the PBGC Appeals

Board found that the Plan "provides that the minimum benefit amount is determined as of the

pilot's Benefit Commencement Date or Termination of Employment date and then is compared

to the Basic Formula amount, with the pilot receiving as retirement income the greater of the two

amounts," *see* AR at 34, thereby precluding any post-retirement adjustments.

Although Plaintiffs would have preferred a different interpretation and application of this

Plan provision, the Court finds that PBGC's more restrictive interpretation that the minimum

benefit amount is calculated and fixed as of one of those two dates, thereby precluding any post-

retirement adjustments, was permissible.

### *3. The 50% supplement for total and permanent disability*

Next, Plaintiffs challenge the PBGC Appeals Board's interpretation of the 50% supplemental benefit for totally and permanently disabled pilots.  Under the Prior Plan, participants deemed "totally and permanently" disabled within two years of becoming disabled were entitled to a 50% increase in their retirement income.  PBGC found that the Plan's minimum benefit "applie[d] to a T&P Disabled participant who started receiving benefits under the Disability Plan on or after December 1, 1974," whereas "the Prior Plan's disability formula (which includes the 50% supplement) applie[d] to a participant who started receiving benefits under the Disability Plan before December 1, 1974."  *See* AR at 36.  Plaintiffs assert that, because the Plan's minimum benefit provision guarantees to all Prior Plan pilots minimum benefits not less than the amount they would have received had the Prior Plan continued without change, the Appeals Board arbitrarily and capriciously excluded this portion of the benefit from the scope of the minimum benefit guarantee.

In reaching its determination, the PBGC Appeals Board found persuasive the following paragraph in § 4.1(E) of the Plan: "The yearly amount of basic retirement income payable under the Plan to a participant who begins receiving disability benefits under the Additional Benefit Programs prior to December 1, 1974 will be equal to the amount he was entitled to receive thereunder."  *See* AR at 387.  PBGC interpreted this provision to assure the 50% supplement only to those totally and permanently disabled participants who began receiving the disability benefit prior to December 1, 1974.  The PBGC Appeals Board concluded that "the Plan's T&P disability retirement formula replaced the disability formula under the Prior Plan."  *See* AR at 36.

The Court finds that Plaintiffs have not met their burden to demonstrate that PBGC acted

unreasonably in determining that totally and permanently disabled former Allegheny Airlines pilots who did not begin receiving disability benefits until on or after December 1, 1974, were not entitled to the 50% supplement under the Plan.

### 4. The 1% termination credit

Finally, Plaintiffs challenge PBGC's determination that it need not apply the so-called "1% termination credit" in making minimum benefit calculations. PBGC held that, although the Prior Plan included a 1% termination credit for forfeitures of non-vested participants, the current Plan eliminated the 1% credit. The PBGC Appeals Board reasoned that (1) the November 21, 1972 Letter Agreement and the 1973 Plan document did not mention the 1% termination credit; (2) the Appeals Board did not locate any subsequent plan or US Airways document discussing the credit; (3) the Appeals Board found no evidence that Allegheny Airlines or US Airways included, at any time, a 1% termination credit in its Prior Plan minimum benefit calculations; and (4) the Prior Plan's termination credit appeared to have been included in the Prior Plan to comply with then-existing IRS requirements, which were no longer relevant under the current Plan. *See* AR at 35.

Plaintiffs contend that the 1% termination credit was unquestionably part of the Prior Plan benefit, "which is the only question relevant to ensuring that the benefits of Prior Plan Pilots 'shall not be less' than those that the Prior Plan would have provided." *See* Dkt. No. 99 at 36. However, the Court finds that it should not upset PBGC's reasoned determination that the current Plan does not provide for a 1% termination credit.

In sum, therefore, the Court finds that Plaintiffs have failed to establish any arbitrary, capricious, or unlawful agency action based on the administrative record that was properly

before

PBGC at the time it rendered its decision in 2008.  Accordingly, the Court grants PBGC's motion

for partial summary judgment on claim eight.

**C.     Plaintiffs' motion to compel an immediate ruling from the PBGC Appeals Board
        with regard to Captain Peterman's appeal**

In their motion to compel, Plaintiffs ask the Court to compel an immediate ruling from

the PBGC Appeals Board in Captain Peterman's appeal and to direct the Appeals Board to

supplement the administrative record with materials filed therein.  *See generally* Dkt. No. 83.

That appeal, however, has since been resolved as the PBGC Appeals Board issued a decision to

Captain Peterman on May 9, 2012.  *See* Dkt. No. 106.  In addition, for the reasons stated above,

Plaintiffs cannot inject into the record materials that were not before the PBGC at the time it

rendered its determination and the Appeals Board's resolution of Captain Peterman's appeal

cannot augment the scope of the administrative record that was before the Appeals Board at the

time it rendered its decision in 2008.  As such, the Court denies Plaintiffs' motion to compel as

moot.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the

applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for summary judgment on claims one, two, three, six,

seven, nine, ten, eleven, and twelve is **DENIED**; and the Court further

**ORDERS** that Defendant PBGC's cross-motion for summary judgment on claims one,

two, three, six, seven, nine, ten, eleven, and twelve is **GRANTED**; and the Court further

-38-

**ORDERS** that Defendant PBGC's motion for summary judgment on claim four is

**GRANTED**; and the Court further

**ORDERS** that Defendant PBGC's resubmitted motion for partial summary judgment on

claim eight is **GRANTED**; and the Court further

**ORDERS** that Plaintiffs' motion to hold Defendant PBGC's resubmitted motion for

partial summary judgment in abeyance is **DENIED** as moot; and the Court further

**ORDERS** that Plaintiffs' motion to compel is **DENIED**.[18]

**IT IS SO ORDERED.**

Dated: May 30, 2012
          Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge

---

[18] Claim five, which is the subject of ongoing discovery, is Plaintiffs' sole remaining claim.  That claim is a breach-of-fiduciary-duty claim, which is very similar to the claim for breach of fiduciary duty in another case before the Court — *US Airlines Pilots Ass'n v. Pension Benefit Guar. Corp.*, 09-CV-1675.

In this case, the Court (Kennedy, J.) stayed discovery pending PBGC's completion of a new plan asset evaluation of the terminated US Airways pension plans (including the Plan), thereby extending discovery 60 days beyond the date on which PBGC serves a copy of the completed asset evaluation on Plaintiffs.  *See* Minute Order dated August 11, 2011.  In *US Airlines Pilots Ass'n v. Pension Benefit Guar. Corp.*, the Court issued an Order on April 23, 2012, requiring PBGC to file monthly status reports regarding the progress of the plan asset evaluation and informed the parties that "[t]he Court [would] closely monitor the progress of the plan asset evaluation and expect[ed] [PBGC] to complete the same and to present its findings and conclusions no later than **September 30, 2012** . . . ."  *See US Airlines Pilots Ass'n v. Pension Benefit Guar. Corp.*, 09-CV-1675, Dkt. No. 81 at 1-2.